UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| TONI SPILLMAN, individually and on behalf of the Class | * CIVIL ACTION NO. 3:10-cv-00349 |
| | * |
| | * |
| | * JUDGE: JACKSON |
| v. | * |
| | * |
| DOMINO'S PIZZA LLC and RPM PIZZA, INC. | * MAGISTRATE:  RIEDLINGER |
| | * |

*********************************************************************

# MEMORANDUM IN OPPOSITION TO
# DOMINO'S PIZZA LLC'S
# MOTION FOR SUMMARY JUDGMENT

RESPECTFULLY SUBMITTED,

**KEOGH, COX & WILSON, LTD.**

BY:    s/Christopher K. Jones
JOHN P. WOLFF, III, Bar #14504
CHRISTOPHER K. JONES, Bar #28101
701 Main Street
Baton Rouge, Louisiana  70802
Telephone:  (225) 383-3796
Facsimile: (225) 343-9612
jwolff@kcwlaw.com
cjones@kcwlaw.com

-and-

Philip Bohrer, Bar #14089
BOHRER LAW FIRM, L.L.C.
8712 Jefferson Highway, Suite B
Baton Rouge, Louisiana 70809
Telephone: (225) 925-5297
phil@bohrerlaw.com

# TABLE OF CONTENTS

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    LAW AND ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      Domino's Pizza LLC, Acting with RPM Pizza, LLC,
                Exercised Significant Control Over the Robo-Call Campaign
                and therefore is Liable under the TCPA. . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.      Domino's Pizza LLC and RPM Pizza, LLC Share Liability for
                the Unsolicited Telephone Advertisement Campaign Because
                Both Parties Controlled its Details and Received its Benefits. . . . . . . . . . 17

        C.      In Order to Protect Citizens' Privacy Rights, the TCPA Provides
                that Domino's Is Independently Liable for Unsolicited Advertisements
                Made "On Behalf of" Domino's. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        D.      Summary Judgment is Inappropriate Given the Facts
                of this Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                1.      Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                2.      Summary Judgment is Improper Because Further Discovery
                        is Necessary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

IV.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# TABLE OF AUTHORITIES

**Statutes**

47 USC §227(c)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

**Cases**

*Anderson v. Domino's Pizza, Inc.*, 2012 WL 1684620
(W.D. Wash. May 15, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). . . . . . . . . . . . . . . . . . . . . . 25

*Applestein v. Fairfield Resorts*, 2009 WL 5604429
(Md. Ct. Spec. App. July 8, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 20

*Billops v. Magnes Const. Co.*, 391 A.2d 196 (Del. 1978). . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bridgeview Health Care Ctr. Ltd. v. Clark*, 2011 WL 4585028
(N.D. Ill. Sept. 30, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). . . . . . . . . . . . . . . . . . . . . . 24, 25, 26

*Chargois v. Triple-L Quik*, 441 So.2d 45, 47 (La. App. 3d Cir. 11/9/83). . . . . . . . . . . . . 6

*Courtesy Outdoor Finance LLC v. Bass, Ltd.*, 2011 WL 933957
(W.D. La. 3/16/11). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Crumpston v. McShane*, 2009 WL 1566484 (Del. Super.
Ct., June 4, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Ermert v. Hartford Ins. Co.*, 559 So.2d 467, 476 (La. 1990).. . . . . . . . . . . . . . . . . . 18, 20

*Glen Ellyn Pharmacy v. Promius Pharma, L.L.C.*, 2009 WL
2973046 (N.D. Ill. Sept.11, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hayes v. Emmon Enterprises*, LLC, 2011 WL 2491375
(S.D. Miss. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 19

*Heirs & Wrongful Death Denefeciaries of Branning ex rel. Tucker v. Hinds Cmty. Coll. Dist.,* 743 So. 2d 311, 318 (Miss. 1999). . . . . . . . . . . . . . . . . . . . . . 5, 19

*Henry v. Taco, Tio Inc.,* 24-112 (La. App. Ct. 2d Cir. 10/28/92), 606 So.2d 1376. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hinton v. Western Casualty and Surety Company, et al,* 435 So.2d 568 (La.App. 3rd Cir.1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Hooters v. Nicholson,* 537 S.E.2d 468 (Ga. Ct. App.2000). . . . . . . . . . . . . . . . . . . . . . 23

*Mims v. Arrow Fin. Services, LLC,* 132 S. Ct. 740, 745 (2012). . . . . . . . . . . . . . . . . . . . 20

*Morgan v. ABC Manufacturer,* 97-0956 (La. 5/1/98), 710 So.2d 1077. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 20

*Parker v. Domino's Pizza, Inc.,* 629 So. 2d 1026, 1029 (Fla. Dist. Ct. App. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Rowell v. Carter Mobile Homes, Inc.,* 500 So.2d 748 (La. 1987). . . . . . . . . . . . . . . . . . . 5

*Simpson v. Kelly Services, Inc.,* 339 So.2d 490, 494 (La. App. 2d Cir. 1976). . . . . . 19, 20

*Stults v. Conoco, Inc.,* 76 F.3d 651 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*TIG Ins. Co. v. Sedgwick James of Washington,* 276 F.3d 754, 759 (5th Cir. 2002). . . . . 24

*Van Pelt v. Paull,* 150 N.W. 2d 185, 188 (Mich. Ct. App. 1967). . . . . . . . . . . . . . . . . . . . 5

*Vaughn v. First Transit, Inc.,* 206 P.3d 181, 187 (Or. 4/16/09). . . . . . . . . . . . . . . . . . . 5, 6

*Viado v. Domino's Pizza, LLC,* 217 P.3d 199, 207 (Or. Ct. App. 2009), *review denied* 226 P.3d 43 (Or. 2/4/10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Worsham v. Nationwide Ins. Co.,* 772 A.2d 868, 878 (Md. Ct. App. 2001). . . . . . . . 23, 24

## Federal Regulations, Orders and Comments

*FTC Comment Before the Federal Communications Commission
Regarding Liability For Telemarketing Calls Under the Telephone
Consumer Protection Act (TCPA)*, CG Docket No. 11-50
(May 2011) (X090039). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*FCC, Rules and Regulations Implementing the Telephone Consumer
Protection Act (TCPA) of 1991*, FCC 03-153, 68 Fed. Reg. 44144,
44165 (July 25, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*In the Matter of Rules and Regulations Implementing the
Telephone Consumer Protection Act of 1991*, 20 FCC
Rcd. 13664, 13667 ¶ 7 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rules and Regulations Implementing the Telephone
Consumer Protection Act of 1991*, Memorandum Opinion
and Order, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## I.    INTRODUCTION

MAY IT PLEASE THE COURT:

Notwithstanding Domino's Pizza LLC's ("Domino's") attempts to establish itself as a distant entity completely uninvolved in the unsolicited telemarketing advertising campaign that gave rise to this suit, the facts established to date show that Domino's statements to the Court are disingenuous because it actively participated in every phase of the marketing scheme and exercised a level of control over the robo-calls that warrants imposition of legal liability pursuant to the federal Telephone Consumer Protection Act ("TCPA").  Now, it attempts to use this motion as a basis to refuse further discovery.  In connection with this filing, Plaintiff files a Rule 56(d) motion to complete discovery on these pertinent issues.

Evidence establishes that Domino's and RPM acted jointly in the telemarketing campaign.  Domino's used a wide variety of tools within its arsenal to control this marketing scheme.  It used its contractual control originating from the franchise agreement.  Domino's used financial incentives to compel RPM to utilize the robo-call campaign in order to increase Domino's profits, at the expense of consumer privacy.  Domino's institutional knowledge of the parties' complicity is apparent, but it consciously orchestrated systems to disavow its actions in an attempt to claim plausible deniablity and avoid liability under the TCPA.

As a result, Domino's request for summary judgment should be denied.  Domino's was an active participant in the telemarketing campaign that exercised control over specific

details of robo-calls made on its behalf. The evidence establishes that Domino's directly profited from the sales generated by the invasive phone calls. As co-conspirators in the scheme, Domino's and RPM shared the financial benefits of the robo-call campaign. As such, both parties should share the liability for their violations of the TCPA.

## II.    FACTUAL BACKGROUND

Domino's and RPM Pizza, LLC ("RPM") conducted a telephone marketing and advertising campaign during which auto-dialed and prerecorded phone messages known as "robo-calls" advertised pizza specials available at Domino's stores ("the campaign"). The messages never mention RPM. Consumers received thousands of these unsolicited and non-consensual phone messages. Toni Spillman received these phone messages on her cell phone as part of Domino's and RPM's campaign. She commenced this action under the TCPA on behalf of herself and all persons in the Class who received the calls. These phone messages were placed or were transmitted either by or on behalf of Domino's and RPM, without the cell phone subscriber's prior express consent.[1]

At this stage of the proceeding, discovery is not complete. As explained in more detail below, all of which is outlined in Plaintiff's pending motions to compel and associated Rule 56(d) filing, Plaintiff demonstrates the defendants are withholding key information relevant to this issue. Specifically, Domino's corporate deposition is not complete because Domino's

---

[1]See deposition transcript from Domino's corporate deposition, from the testimony of Christopher Roeser, attached as Exhibit 1, at pp. 106-108. This exhibit is filed under seal pursuant to the Protective Order entered in this suit (R. Doc. 119).

failed to provide representatives able to competently address a number of topics identified in the Rule 30(b)(6) notice. Further, Domino's unreasonably limited the scope of its production of documents when it unilaterally chose the topics, terms and individuals to include in its discovery search. Moreover, despite ongoing requests, RPM has failed to tender a representative for deposition and also failed to provide adequate responses to written discovery.

Nevertheless, the documents Plaintiff received to date prove that Domino's was an active participant in the campaign. It conspired with RPM to make the calls and exercised significant control over specific details of the campaign. Domino's aggressively urged its franchisees, specifically RPM, to use various vendors able to conduct telephone advertising campaigns.[2] Domino's also distributed a company-wide newsletter, entitled "Fast-Facts," in which Domino's praised franchisees for their use of "auto-calling messages."[3] Additionally, the Domino's Manager's Reference Guide, that includes mandatory provisions individual stores must follow, instructs its managers to "████████████████████ ████████████████" to get started with robo-calls to "████████████████ ████████████"[4]

Domino's negotiated indemnificaton language it required its franchisees to include

---

[2] See Dominos_Spillman 484-485 attached as Exhibit 2 and Dominos_Spillman 599, attached as Exhibit 3.

[3] See RPM 17478, attached as Exhibit 4 and RPM 4038-4040, attached as Exhibit 5.

[4] See Dominos_Spillman 151, attached as Exhibit 6.

in any contract with vendors.[5] Domino's financed the campaign with money from the Domino's National Advertising Fund ("DNAF").[6] Domino's attempts to disavow its joint involvement in the campaign. But Domino's collected telephone numbers on its website, "███████████" of keeping the data, and then gave the numbers to its franchisee, with full knowledge that robo-calls would take place.[7]

Further, Domino's actively promoted the use of telephone advertising. By way of example, RPM "████████" the calls from most of its stores at Domino's request.[8] Additional evidence shows that a Domino's representative referenced the RPM campaign and encouraged franchisees to "███████████" to improve sales.[9]

The facts indicate that Domino's, acting jointly with RPM, exercised significant control over the advertising campaign, in which telephone advertisements were transmitted on behalf of Domino's. The TCPA provides that Domino's is liable under these circumstances. Domino's and RPM both exercised control and reaped the benefits of the campaign. Therefore, Domino's and RPM should share liability for the campaign and

---

[5] See Dominos_Spillman 4021-4023, attached as Exhibit 7; and CEA 1496, attached as Exhibit 8.

[6] See Dominos_Spillman 692-693, attached as Exhibit 9 (where Chris Roeser acknowledged "█████████████████████"); RPM 2687, attached as Exhibit 10 (where ███████████████████████████████████████ ████████").

[7] See Exhibit 1, pg. 84, ln. 23 - pg. 85, ln. 4.

[8] See Dominos_Spillman 388, attached as Exhibit 11.

[9] See Dominos_Spillman 6573, attached as Exhibit 12.

Domino's Motion for Summary Judgment should be dismissed.

## III.   LAW AND ARGUMENT

### A.   Domino's Pizza, LLC, Acting Jointly with RPM Pizza, LLC,  Exercised Significant Control Over the Robo-Call Campaign and therefore is Liable under the TCPA.

The Franchise Agreement between Domino's and RPM states that RPM is an independent contractor.[10]  However, the terms of the relationship between franchisor and franchisee, as stated in the franchise agreement, do not end the inquiry regarding franchisor liability. See  *Hayes v. Emmon Enterprises*, LLC, 2011 WL 2491375 (S.D. Miss. 2011); *Heirs & Wrongful Death Denefeciaries of Branning ex rel. Tucker v. Hinds Cmty. Coll. Dist.,*743 So. 2d 311, 318 (Miss. 1999); *Van Pelt v. Paull*, 150 N.W. 2d 185, 188 (Mich. Ct. App. 1967).

A franchisor can be found liable when the parties' relationship allows the franchisor to control the physical details of the franchisee, specifically as to the manner of the franchisee's performance. Liability can also attach when the franchisee's acts are in the service of the franchisor, and the franchisor has control of those acts.  *Henry v. Taco, Tio Inc.*, 24-112 (La. App. Ct. 2d Cir. 10/28/92), 606 So.2d 1376, 1381. See also *Rowell v. Carter Mobile Homes, Inc*., 500 So.2d 748 (La. 1987).  Specifically, a franchisor may be vicariously liable for its franchisees' acts when there is"a connection between the principal's 'right to control' the agent's actions and the specific conduct giving rise to the tort claim."

---

[10] See Franchise Agreement, at Domino's_Spillman 38,  ¶ 22.8, attached as Exhibit 13.

*Vaughn v. First Transit, Inc.*, 206 P.3d 181, 187 (Or. 4/16/09). Here, evidence indicates that Domino's not only had a "right to control" the robo-call campaign, but it worked with RPM to exercise that control in a number of different ways.

Analysis of the extent to which a franchisor controls its franchisee is a fact-sensitive inquiry. Issues of material fact almost always are present in such an analysis. For this reason, a determination of a franchisor's control and subsequent vicarious liability is inappropriate for summary judgment. *Chargois v. Triple-L Quik*, 441 So.2d 45, 47 (La. App. 3d Cir. 11/9/83). See also, *Hinton v. Western Casualty and Surety Company, et al,* 435 So.2d 568 (La.App. 3rd Cir.1983); *Hayes v. Emmon Enterprises*, LLC, 2011 WL 2491375, at *6 (S.D. Miss. 2011).

The issue of franchisor control survived summary judgment in *Billops v. Magnes Const. Co.*, 391 A.2d 196 (Del. 1978). In *Billops*, the franchise operating manual, which contained mandatory provisions, was incorporated into the Franchise Agreement. The franchisee was required to maintain detailed records to ensure compliance with the operating manual. The court noted that this indicated control. Also, the franchisor had significant enforcement power and could terminate the agreement unilaterally.

Similarly, *Crumpston v. McShane* reiterated that "agency [and therefore liability] exists when the franchise agreement goes beyond setting standards, but instead allocates the right to control daily operations." 2009 WL 1566484 (Del. Super. Ct., June 4, 2009). The *Crumpston* court found that an issue of material fact existed as to whether the franchisor

"created an appearance of authority over its franchisees to the general public, by way of the franchise agreement." *Id*. at 4. As such, summary judgment was not appropriate.

Evidence establishes the same result should follow here. Domino's exercised significant control of the details of its franchisees' acts, including advertising, marketing and this particular robo-call campaign. Domino's franchisees recognized the dynamic of their relationship with Domino's, specifically Domino's increasing authority over their acts and a "███████████████████████████████████"[11] RPM noted a "████████" in the control Domino's exercises over advertising. For example, in 1997, RPM controlled ████ ██████████████████ and Domino's controlled ████. As of June of 2007, RPM controlled ████ and Domino's controlled ████.[12] Trends such as these led Glenn Mueller of RPM to remark that the Franchise Agreements indicate that franchisees' "████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████"[13]

All franchisees were required to enter a Franchise Agreement with Domino's, the terms of which were under Domino's complete control. Franchisees have no potential to negotiate the terms of the Agreement.[14] In these Agreements, Domino's dictates numerous

---

[11] See RPM 4776, attached as Exhibit 14.

[12] *Id*.

[13] See RPM 4775, attached as Exhibit 15.

[14] See deposition transcript from Domino's corporate deposition, from the testimony of Joseph Devereaux, attached as Exhibit 16, at pg. 8, lns. 11-23. This exhibit is filed under seal

requirements related to operation of franchisee stores.  For example, the Agreement specifies equipment, furniture, and signs used at the stores; the uniforms worn by the employees; and even the tools used to cut pizzas.[15]  Domino's also can require potential owners/franchisees to take a curriculum of classes prior to consideration of owning a franchise.[16]

Domino's maintains its control of its franchisees' acts down to the physical line where pizzas are made.  The Franchise Agreement requires the franchisee to meet all specifications on how a pizza is made.  In short, Domino's is in complete and total control over the components of a pizza.[17] In one instance, RPM had to petition Domino's for the right to cut a 10 inch pizza into four slices, instead of the customary six slices.[18]

Directly relating to the activity giving rise to this suit, Domino's controlled details of its franchisee's advertising. The Franchise Agreement required the franchisee to participate in local and regional advertising cooperatives.[19]  For example, Domino's scheduled marketing activities for its franchisees' stores that required store employees to visit local businesses, give away products to local media stations, at franchisee expense, and pass out

---

pursuant to the Protective Order entered in this suit (R. Doc. 119).

[15] See Exhibit 16, at pgs. 43-44, pg. 90, lns. 21-24.

[16] See Exhibit 16, at pg. 44, lns. 5-16.

[17] See Exhibit 16, at pg. 45, lns. 1-24.

[18] See RPM 6544, attached as Exhibit 17.

[19] See Exhibit 13,  § 13 at Dominos_Spillman 18-20. See also Exhibit 16, pg. 46, lns. 5-22.

approved print media, all on dates of Domino's choosing.[20]

Franchisees also had to submit print, TV, radio and electronic media advertisements to Domino's for approval.[21]  Correspondence between RPM representatives indicated that while Domino's recommended that its official "order online" logo be used on all print material, RPM needed "███████████████████████████████████."[22] Similar advertisement specifications are present in the Domino's Managers' Reference Guide.  The Guide requires managers to contact Domino's for direction and/or approval to use the words ████████████████ in any form of advertising. Domino's also puts limits on fonts and typographic formats that are approved to be used in advertising.[23]

Domino's control of and participation in advertising extended to the robo-call campaign at issue in this suit. Domino's not only had institutional knowledge of the campaign, but it also facilitated and encouraged its use.  Domino's collected phone numbers and pushed RPM to use those numbers for the robo-call campaign.[24] Franchisees were required to purchase and use a "PULSE" software system for use in each store.[25] The PULSE

---

[20] See RPM 5037-5038 and 2008 Mkg.update attached within, attached as Exhibit 18.

[21] See Exhibit 13,  § 13.3 at Dominos_Spillman 20; see also Exhibit 16, pg. 93, lns. 16-22.

[22] See RPM 4710, attached as Exhibit 19 (emphasis supplied).

[23] See Manager's Reference Guide excerpt, D-S 273-285, attached as Exhibit 20.

[24] See Exhibit 1, pg. 36, lns. 1-19.

[25] See Exhibit 1, pg. 62, lns. 15-24.

system captured and stored customers' phone numbers when they placed an order.[26] Although Domino's failed to provide a deposition representative who could address specific issues related to operation of the PULSE system, evidence indicates that PULSE was used to collect numbers eventually called as part of the robo-call campaign.

Additionally, the "dominos.com" website captured numbers used to develop customer lists. These customer lists were Domino's exclusive property,[27] but the testimony of Christopher Roeser, the designated Domino's representative, proves that Domino's collected these numbers and gave them to its franchisees, with full knowledge that robo-calls would take place.



Further, the system did not retain any documentation from Domino's consumers that might indicate how these numbers were obtained.[29] Roeser testified as follows:

---

[26] See Exhibit 1, pg. 63, lns. 23-24.

[27] See Exhibit 16, pg. 42, lns. 2-25.

[28] See Exhibit 1, pg. 84, ln. 23 - pg. 85, ln. 4.

[29] See Exhibit 1, pg. 36, ln. 20 - pg. 37, ln. 9.

███████████████████████████████████████████[30]

Simply, Domino's did not keep records of this practice because it wanted to maintain its plausible deniability of the robo-call campaign and "███████████" of keeping the data.[31]

Domino's made clear that advertising funds were available to those franchisees that wanted to participate in these telemarketing campaigns.[32] Franchisees that responded to Domino's push for telemarketing were directed to vendors to develop advertising contracts and initiate robo-calls. Although Domino's was not a direct party to these contracts, it provided its franchisees with a contract designed to protect Domino's and its franchisees from potential liability of the robo-calls it knew could occur.[33] In this regard, Domino's engaged in extensive negotiations to develop indemnification language to be included in these contracts. Participating franchisees were required to include this indemnification language in any contracts with telemarketing vendors.[34]

Domino's continued its active participation in the robo-call campaign after it gave its customers' phone numbers to RPM. Domino's recognized the financial incentive of the

---

[30] See Exhibit 1, pg. 36, ln. 24 - pg. 37, ln 3.

[31] See Exhibit 1, pg. 84, ln. 23 - pg. 85, ln. 1.

[32] See Exhibit 9 (where Chris Roeser states that outbound calling programs are "████████ ████████████████████████████████████████ ").

[33] See Exhibit 1, pg. 90, ln. 21 - pg. 91, ln. 6.

[34] See Exhibit 1, pg. 107, lns. 13-24. See also RPM 23001, attached as Exhibit 21 and Exhibits 8 and 9.

campaign and urged its franchisees to increase the volume of calls. In reference to a robo-call advertising schedule, Richard Mueller of RPM indicated, "█████████████████████ ████████████████████████████████████████████████████████ █████████████"[35] Domino's representative Scott McLeod stated that RPM's use of robo-calls indicates "████████" and "██████████."[36] Franchisees were told to "████████" and that Domino's would help initiate the process ("████████████████████ ████████████████████████").[37]

Michael O'Brien, III, another Domino's representative (and coincidentally now a former employee of Domino's), provided intricately specific strategy for robo-call scheduling utilized to improve quarterly sales. In an email to various franchisees, he recommended, "█ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████"[38] Based upon Domino's level of involvement in the robo-call campaign, it is not surprising that correspondence between RPM and Call-em-All reveals that those parties were unwilling to re-engage a delayed robo-call campaign until they received input from Domino's corporate regarding the numbers RPM and Call-em-All had

---

[35] See Exhibit 11.

[36] See Exhibit 12.

[37] *Id*.

[38] See Dominos_Spillman 6563-6564, attached as Exhibit 22.

permission to call.[39]

Domino's institutional knowledge of this practice is apparent because Domino's was aware of customer complaints filed regarding unwanted telephone solicitation that consumers received on Domino's behalf.[40]  The telemarketing message only identified Domino's by name. RPM was never mentioned.[41] As a result, Domino's received numerous complaints from its customers. For example:



- (emphasis original).[42]

Domino's frequent response to these complaints was issuance of a "standard customer

---

[39] See CEA 1486-1487, attached as Exhibit 23.

[40] See Exhibit 1, pgs. 110-112; pgs. 123, lns. 6-14.

[41] See Plaintiff's Class Action Complaint, at ¶ 25 (R. Doc. 1-1).  ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮")

[42] See Dominos_Spillman 515-516, attached as Exhibit 24.

[43] See Dominos_Spillman 3106-3107, attached as Exhibit 25.

complaint letter." These were generic letters that acknowledged "███████████████████

███████████████████████████████████████████████████████████████████

██████"[44]

Domino's also received complaints from customers on the Do Not Call Registry. In one instance, a store owner told the complaining customer she was called because of a problem with the store's software system/PULSE.[45] Domino's admitted "███████████████████

████████████████████████████████"[46] In spite of Domino's knowledge of this problem, it decided it was "██████████████████████████████████████████████

██████████"[47]

The facts indicate that Domino's had the ability to stop the robo-call campaign, but choose not to do so. Domino's CEO David Brandon addressed robo-calls as follows:

[48]

However, driven by financial incentive, Domino's chose not to stop the robo-call practice. Instead, as seen by the evidence presented, Domino's promoted its practice to meet sales

---

[44] See Exhibit 1, pg. 110, lns. 10-15.

[45] See Domino's Spillman 589-591, attached as Exhibit 26.

[46] Id.

[47] Id.

[48] See Dominos_Spillman 6683-6686, attached as Exhibit 27.

goals.

This evidence creates material issues of fact that indicate Domino's controlled specific aspects of both RPM's day-to-day activity and the robo-call campaign. Domino's conspired with RPM to develop a scheme in which both companies acted jointly to maximize sales at the expense of consumer privacy protected by the TCPA. On these grounds, Domino's is liable under the TCPA and its motion for summary judgment should be dismissed.

Domino's cannot cite jurisprudential support for its arguments. In *Anderson v. Domino's Pizza, Inc.*, 2012 WL 1684620 (W.D. Wash. May 15, 2012), the court found Domino's was not liable under a Washington state statute for unsolicited calls made to consumers. However, the facts are not similar to this case. The *Anderson* plaintiff did not meet his burden to identify facts that show a genuine issue for trial because he was unable to present specific evidence that indicated Domino's participation in and control of the robo-call campaign. In other words, none of the evidence offered in opposition to this motion was offered to oppose Domino's motion in the *Anderson* case.

Here, Plaintiff proves that Domino's was an active participant that used its influence to coerce its franchisee to utilize robo-call campaigns. As such, material issues of fact exist that preclude the entry of summary judgment. In fact, other courts have specifically held that Domino's relationship with its franchisees creates the potential for an agency relationship and therefore should not be decided upon summary judgment.

In *Parker v. Domino's Pizza, Inc.*, 629 So. 2d 1026, 1029 (Fla. Dist. Ct. App. 1993),

the court found Domino's exercised sufficient control to create factual issues regarding whether the franchisor could be vicariously liable for its franchisee's acts. It reasoned as follows:

> The manual which Domino's provides to its franchisees is a veritable bible for overseeing a Domino's operation. It contains prescriptions for every conceivable facet of the business: from the elements of preparing the perfect pizza to maintaining accurate books; from advertising and promotional ideas to routing and delivery guidelines; from order-taking instructions to oven-tending rules; from organization to sanitation. The manual even offers a wide array of techniques for "boxing and cutting" the pizza, as well as tips on running the franchise to achieve an optimum profit. The manual literally leaves nothing to chance. *Id*.

Similarly, the court in *Viado v. Domino's Pizza, LLC*, 217 P.3d 199, 207 (Or. Ct. App. 2009), *review denied* 226 P.3d 43 (Or. 2/4/10), found Domino's controlled its franchisee to such an extent that an agency relationship could be established. It held a reasonable juror could conclude "the rules and operating procedures went beyond the stage of setting standards, and that Domino's retained sufficient control over certain day-to-day operations of... its franchisee, to establish an agency relationship." *Id*.

In its motion, Domino's relies heavily upon *Applestein v. Fairfield Resorts*, 2009 WL 5604429 (Md. Ct. Spec. App. July 8, 2009), in which the court held the defendant did not initiate calls made by a third party vendor and could not be held liable under the TCPA. However, this decision is factually distinguishable from the present matter. The *Applestein* plaintiff received pre-recorded telemarketing calls to his residential phone line. *Id*. Evidence showed the defendant expressly prohibited the vendor from using pre-recorded message

programs. The court found for the defendant because there was "no evidence in the record that [the defendant] ever approved the use of pre-recorded telemarketing calls by [the vendor]." *Id*. at *8.

Domino's reliance upon *Applestein* is misplaced. It cannot claim that it prohibited any party from using pre-recorded message programs. In fact, evidence establishes that Domino's encouraged their use. It recommended specific vendors who specialized in the delivery of pre-recorded phone messages.[49] It also facilitated the use of pre-recorded message programs when it provided the phone numbers eventually called in the robo-call campaign,[50] and actively promoted these programs in effort to improve sales and increase profits.[51] For these reasons, Domino's is liable under the TCPA.

**B. Domino's and RPM Share Liability for the Unsolicited Telephone Advertisement Campaign Because Both Parties Controlled its Details and Received its Benefits.**

Alternatively, Domino's is also liable for TCPA violations under the theory of enterprise liability. Domino's asserts that its lack of supervisory control over RPM should form the basis for its tort immunity. Domino's chose to pass some control of the details of its advertising campaign to RPM. Therefore, Domino's and RPM had both overlapping control and shared financial interest in the telephone solicitation program. Therefore, it is

---

[49] See Exhibit 2 and Exhibit 3.

[50] See Exhibit 1, at pg. 84, lns. 17-22.

[51] See Exhibit 11 and Exhibit 12.

reasonable that they share liability in this matter under *Morgan v. ABC Manufacturer*, 97-0956 (La. 5/1/98), 710 So.2d 1077.

In *Morgan*, the Louisiana Supreme Court approved the extension of liability under the theory of enterprise liability when it held that "modern justification for employer liability is not based so much on the employer's control, but on the concept of 'enterprise liability.'" *Id*. In so holding, the Louisiana Supreme Court cited the following from its decision in *Ermert v. Hartford Ins. Co.*, 559 So.2d 467, 476 (La. 1990):

> The master's vicarious liability for the acts of its servant rests not so much on policy grounds consistent with the governing principles of tort law as in a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities.

In *Morgan*, the Court found that a significant feature of the defendant's business was the fact that it passed control of the details of its business to its customers/another entity. *Morgan*, at 1083. The case presented a system of dual control in which both parties received benefits because of that system. The Court found that the employee accused of the wrongful act furthered the business of two parties simultaneously.

As such, the Court found that both parties should share liability. Based upon this logic, it held:

> Since modern justification for employer liability is not based so much on the employer's control of the employee's actions, but on the concept of "enterprise liability," [the defendant's] failure to exercise direct supervisory control over [the employee accused of the wrongful act] should not preclude its liability.

*Morgan*, 710 So. 2d at 1084.

-18-

The same should be true in the present matter. Domino's and RPM shared control over the telemarketing vendors in the robo-call campaign. Similar to the facts in *Morgan*, the unsolicited telephone marketing campaign simultaneously furthered the business of Domino's and RPM. Domino's received ███████████████████[52] Testimony of Domino's, through Christopher Roeser, indicates that Domino's could expect to receive direct benefit from the campaign:



Communication between RPM and Domino's also acknowledged that even though the robo-calls upset customers, they generated ████████████████[54] According to the above-cited testimony, Domino's received direct profits from the scheme it engineered with RPM.

The Franchise Agreement between Domino's and RPM states that RPM is an independent contractor.[55] However, as previously indicated, the terms of the relationship as stated in the franchise agreement do not end the inquiry. See *Hayes,* 2011 WL 2491375; *Heirs & Wrongful Death Beneficiaries of Branning ex rel. Tucker*, 743 So. 2d 311. In order to determine whether an independent contractor is treated as an employee, the court should

---

[52] See Franchise Agreement § 6.1, at Dominos_Spillman 12, attached as Exhibit 13.

[53] See Exhibit 1, pg. 44, lns. 20-24.

[54] See Dominos_Spillman 6497-6498, attached as Exhibit 28.

[55] See Franchise Agreement § 22.8, at Dominos_Spillman 38, attached as Exhibit 13.

-19-

examine each party's amount of control and each party's right of control. *Simpson v. Kelly Services, Inc.*, 339 So.2d 490, 494 (La. App. 2d Cir. 1976). For the reasons explained above, evidence establishes that Domino's exercised substantial control over RPM. Domino's controlled not only day-to-day operations of its franchisees but it also controlled specific aspects of the robo-call campaign.

Domino's control over these acts creates the relationship present in *Morgan* and *Ermert*. Domino's and RPM shared the control and benefit of the robo-call campaign. As such, the rule established in *Morgan* applies and Domino's is liable for the robo-call campaign under a theory of enterprise liability.

C.    **In Order to Protect Citizens' Privacy Rights, the TCPA Provides that Domino's Is Independently Liable for Unsolicited Advertisements Made "On Behalf of" Domino's.**

The strict interpretation of the TCPA that Domino's proposes ignores the general purpose of the TCPA. Justice Ginsburg, speaking for a unanimous Supreme Court, recently acknowledged that in enacting the TCPA, Congress noted consumer "outrage" over the proliferation of intrusive telemarketing calls and found that automated or prerecorded telephone calls "were rightly regarded by recipients as 'an invasion of privacy.'" *Mims v. Arrow Fin. Services, LLC*, 132 S. Ct. 740, 745 (2012). Congress enacted the TCPA "to protect the privacy rights of citizens by restricting the use of the telephone network for unsolicited advertising." See *Applestein*, 2009 WL 5604429 at *5; *FCC, Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991*, FCC

03-153, 68 Fed. Reg. 44144, 44165 (July 25, 2003). Citizens' privacy rights can be protected adequately only if liability extends to the entity on whose behalf the telemarketing calls were made. Otherwise, an entity such as Domino's can sidestep the TCPA and invade consumers' privacy rights simply by outsourcing the telemarketing campaign to a third party. As such, the "on behalf of" language present in §227(c)(5) should apply to this matter.

47 USC §227(c)(5) states, in pertinent part, as follows:

> A person who has received more than one telephone call within any 12-month period by or *on behalf of* the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State...

(emphasis supplied). Congress extended liability for TCPA violations under §227(c)(5) to those parties on whose behalf the calls were made. Thus, the acts of an independent contractor found to violate §227(c) also can be attributed to the principal entity on whose behalf those calls were made.

Congress granted the Federal Communications Commission (FCC) the power to prescribe regulations to implement the requirements of the TCPA. Although Domino's cites the Code of Federal Regulations to attempt to establish otherwise, the FCC consistently has interpreted the TCPA to extend liability for all calls "on behalf of" the entity in violation of the regulations prescribed. FCC precedent clearly indicates that a call placed by an independent contractor that markets a principal's products should qualify as a call made on

behalf of, and initiated by[56] or made by,[57] the principal.

In 1995, the FCC explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations [of the TCPA]." *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Memorandum Opinion and Order, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995). In this same order, the FCC stated, "Calls placed by an agent of a telemarketer are treated as if the telemarketer itself placed the call." *Id*. This 1995 FCC order echoes the "on behalf of" language of the TCPA found in §227(c)(5).

This decision is consistent with other FCC decisions as well. In 2005, the FCC granted a Request for Clarification and Declaratory Ruling to clarify whether agents of State Farm could rely upon the "established business relationship" exemption to the TCPA. Vendors made solicitations to consumers on a do-not-call list on behalf of State Farm. Although the noted exemption is not applicable to this case, the FCC highlighted its traditional interpretation of the TCPA when it stated,

> We take this opportunity to reiterate that a company on whose behalf a telephone solicitation is made bears the responsibility for any violation of our telemarketing rules and calls placed by a third party on behalf of that company are treated as if the company itself placed the call.

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 20 FCC Rcd. 13664, 13667 ¶ 7 (2005). As such, FCC precedent and regulations

---

[56] See 47 U.S.C. § 227(b)(1)(B).

[57] See 47 U.S.C. § 227(b)(1)(A).

appear to support inclusion of the "on behalf of" language for the entire TCPA.

Further, the FTC also supports this position. The FTC submitted a comment to the FCC, which was approved by a 4-0 vote, to promote a reading of the TCPA that extends liability to parties on whose behalf a call was made. It made this comment to promote parallel enforcement of the TCPA and the Telemarketing Act and to comport with FCC precedent as described above. See *FTC Comment Before the Federal Communications Commission Regarding Liability For Telemarketing Calls Under the Telephone Consumer Protection Act (TCPA)*, CG Docket No. 11-50 (May 2011) (X090039).

In the context of fax solicitation, Courts have relied upon the FCC's interpretation to conclude that defendants cannot escape liability simply by hiring an independent contractor to transmit unsolicited facsimiles on their behalf. *Bridgeview Health Care Ctr. Ltd. v. Clark*, 2011 WL 4585028 (N.D. Ill. Sept. 30, 2011). See also *Glen Ellyn Pharmacy v. Promius Pharma, L.L.C.*, 2009 WL 2973046, at *4 5 (N.D. Ill. Sept.11, 2009); *Worsham v. Nationwide Ins. Co.*, 772 A.2d 868, 878 (Md. Ct. App. 2001); *Hooters v. Nicholson*, 537 S.E.2d 468 (Ga. Ct. App.2000).

In *Worsham v. Nationwide Ins. Co.*, the Court noted the "TCPA reaches not only the entity making the telephone solicitation, but also **any** entity 'on whose behalf' such calls are made." 772 A.2d at 878 (emphasis supplied) . Phone scripts delivered by a vendor stated they were calling "for Nationwide" (the principal) without mention of an individual agency (the agent). This was sufficient to raise a dispute as to whether the solicitation was made on

behalf of Nationwide. *Id*. at 878-879. The same arrangement is present in this case where the vendors delivered messages which stated the calls were from Domino's, with no mention of RPM.[58]

The same result should follow in the present matter.  The TCPA was enacted to protect the privacy rights of consumers, and it explicitly empowered consumers with private rights of action to enforce the TCPA. To deny consumers a right of action against a party the call was made "on behalf of" would be to deny Congress' goals in passing the statute. Consumers' privacy rights would not be protected sufficiently, and a company would be free to outsource its calls in order to escape liability, as Domino's attempts to do in this case. A limited interpretation of "on behalf of" would allow Domino's to continue to sidestep the TCPA and invade the privacy rights of consumers.  As such, the TCPA provides that Domino's should be liable for the robo-call campaign.

**D.    Summary Judgment is Inappropriate Given the Facts of this Case.**

1.    <u>Summary Judgment Standard</u>.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is proper and should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *TIG Ins. Co. v. Sedgwick James of Washington,*

---

[58] See Plaintiff's Class Action Complaint, at ¶ 25 (R. Doc. 1-1).

276 F.3d 754, 759 (5th Cir. 2002). The substantive law will identify material facts. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. See *Stults v. Conoco, Inc.*, 76 F.3d 651 (5th Cir. 1996). Plaintiff need only identify facts that show a genuine issue for trial if the moving party meets this burden. *Celotex Corp.* 477 U.S. at 322.

In this instance, Domino's summary judgment request is not appropriate. Contrary to the arguments presented in Domino's Motion, issues of material fact exist regarding the amount of control Domino's exercised over the advertising campaign. Evidence indicates that Domino's conspired with RPM and controlled a number of specific factors vital to the campaign, which, in turn, makes Domino's liable under the TCPA.

Domino's and RPM shared control of the campaign. They shared the financial benefits of the campaign. It follows that they also should share liability for the campaign. The existence of material facts such as these, paired with Domino's independent liability under the TCPA for calls made on its behalf, preclude summary judgment.

<div style="text-align:center">

2.     <u>Summary Judgment is Improper Because Further Discovery is Necessary</u>.

</div>

Motions for summary judgment made before the opposing party has had a reasonable opportunity for investigation and discovery are dealt with under F.R.C.P. Rule 56(d). Rule 56(d) prevents the opposing party from being "railroaded" by a premature motion for

summary judgment. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Under the rule, if the opposing party presents a declaration showing specific reasons why it cannot present facts essential to its opposition, the Court may either (1) defer considering the motion or deny it, (2) continue the hearing to allow additional time to obtain affidavits or to take discovery, or (3) issue some other appropriate order for relief. See F.R.C.P. Rule 56(d). This issue will be addressed more fully in a separate motion.

However, for present purposes, summary judgment proceedings are improper if a party demonstrates (1) why it needs additional discovery; (2) how the additional discovery will likely create a genuine issue of material fact and (3) justification for why discovery could not have been obtained at an earlier date. *Courtesy Outdoor Finance LLC v. Bass, Ltd.*, 2011 WL 933957 (W.D. La. 3/16/11). Plaintiff can establish each of these requirements.

Additional discovery is required to obtain further facts regarding the nature of the advertising campaign. Domino's unreasonably limited the scope of its search for documents to produce in response to Plaintiff's discovery requests. Further, Domino's did not provide representatives at its Rule 30(b)(6) deposition who were able to testify regarding many topics relevant to this suit. As such, Plaintiff lacks significant discovery because Domino's has not cooperated with prior discovery requests and has refused to offer relevant information related to significant issues in this case. These issues are explored in Plaintiff's Motion to Compel filed against Domino's, currently pending before this Court. R. Doc. 146-147.

In addition to the documents that Domino's chose not to produce, Plaintiff has long since requested and will need to take the depositions of the following persons/entities to present facts essential to the elements of its case:

- Representative(s) of RPM Pizza, LLC;

- Representative(s) of Fidelity Communications Corporation, a vendor recommended by Domino's and hired by RPM to conduct telemarketing calls; and

- Additional representatives of Domino's able to provide testimony regarding topics identified in the deposition notice.

In light of significant outstanding discovery in this matter, Domino's motion for summary judgment is premature under Rule 56(d).

## IV. CONCLUSION

The arguments that Domino's raises in its Motion for Summary Judgment are unsupported by the evidence and therefore are without merit. Conversely, evidence that indicates Domino's liability is so clear that the Court could consider granting summary judgment for Plaintiff. Domino's engaged its franchisee, RPM, in a telemarketing campaign that violated the TCPA. Domino's was actively involved in the campaign and controlled specific acts related to transmission of the phone messages. Acting jointly, Domino's and RPM developed a scheme in which thousands of unsolicited and non-consensual telephone messages were delivered on their behalf. These calls were designed to increase sales and generate increased profits for both Domino's and RPM. The TCPA provides that Domino's is independently liable on these grounds.

For the foregoing reasons, Domino's Motion for Summary Judgment should be denied.

<div align="center" style="margin-left:40%">

RESPECTFULLY SUBMITTED,

**KEOGH, COX & WILSON, LTD.**

BY:   s/Christopher K. Jones
JOHN P. WOLFF, III, Bar #14504
CHRISTOPHER K. JONES, Bar #28101
701 Main Street
Baton Rouge, Louisiana  70802
Telephone:  (225) 383-3796
Facsimile: (225) 343-9612
jwolff@kcwlaw.com
cjones@kcwlaw.com

-and-

Philip Bohrer, Bar #14089
BOHRER LAW FIRM, L.L.C.
8712 Jefferson Highway, Suite B
Baton Rouge, Louisiana 70809
Telephone: (225) 925-5297
phil@bohrerlaw.com

</div>

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

I hereby certify that a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all known counsel by operation of the court's electronic filing system. I also certify that, as of the date of this mailing, there are no manual recipients identified to receive this mailing.

Baton Rouge, Louisiana, this  11  day of June, 2012.

<div align="center">

s/ Christopher K. Jones
JOHN P. WOLFF, III
CHRISTOPHER K. JONES

</div>