UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


TONI SPILLMAN

VERSUS

RPM PIZZA, LLC, ET AL

CIVIL ACTION

NUMBER 10-349-BAJ-SCR

### FAIRNESS HEARING: RULE 23(e) FINDINGS

This matter came before the court on March 12, 2013 for a fairness hearing pursuant to Rule 23(e), Fed.R.Civ.P. to determine whether the class action settlement preliminarily approved on November 9, 2012 is fair, reasonable, adequate and in the best interest of the class. Based on the entire record of this proceeding, including the presentation of counsel and the evidence filed in the record at the time of the hearing, the court makes the following findings and approves the settlement.

**Class Action Fairness Act**

This is a class action settlement of litigation that began with the filing of a Class Action Complaint on May 20, 2010 by plaintiff Toni Spillman against defendants RPM Pizza, Inc. and Domino's Pizza, LLC. The complaint alleged the defendants violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.[1]

---

[1] At the time the complaint was filed jurisdiction was alleged under both federal law and the Class Action Fairness Act ("CAFA"). In 2012, after this complaint was filed, the Supreme Court in *Mims v. Arrow Financial Services, LLC*, ____ U.S. ____, 132 S.Ct. 740
(continued...)

After several amendments to the complaint, the class is now composed of persons who received automated telephone calls ("robo-calls") to their cellular phone numbers made by or on behalf of RPM or one of its Domino's franchise stores from May 20, 2006 to May 20, 2010. The Settlement Agreement[2] creates a common fund totaling $9,750,000. Therefore, the settlement is subject to CAFA, and a CAFA settlement must comply with 28 U.S.C. § 1714 and § 1715.

Under § 1714 the proposed settlement does not provide for the payment of greater sums to some class members than to others, solely on the basis that the class members to whom the greater sums are to be paid are located in closer geographic proximity to the court. The members of the largest sub-class, which is the Merchandise Voucher sub-Class will receive a fully transferrable, single-use voucher for a large one-topping pizza which can only be redeemed for in-store pick-up at an RPM-owned Domino's store in the states of Louisiana, Alabama and Mississippi.[3] However, the basis for geographic limitation has nothing to do with geographic

---

[1](...continued)
(2012), held that federal and state courts have concurrent jurisdiction under the TCPA. Therefore, federal district courts have federal question jurisdiction over TCPA claims. This case overruled the Fifth Circuit decision in *Chair King, Inc. v. Houston Cellular Corp.*, 131 F.3d 507 (5th Cir. 1997), which was controlling at the time the complaint was filed.

[2] Record document number 222-3, Motion for Preliminary Approval, Exhibit A.

[3] *Id.*, Settlement Agreement, § 1.12, definitions of Monetary sub-class and Merchandise Voucher sub-class.

proximity to the court. This provision is a result of the fact that settling defendant RPM operates in these three states, and the vast majority of the class members have phone numbers with area codes originating from Louisiana, Alabama and Mississippi.[4]

The testimony and exhibits also establish that notice of the proposed settlement, along with the appropriate settlement documents, has been given to the Attorney General in Washington D.C., and the Attorneys General in all 50 states and the District of Columbia. Notice of Compliance with § 1715 has been filed into the record. The 90-day period required by § 1715(d) has expired and no officials have filed objections to the settlement.[5] The court finds that the proposed settlement complies with the CAFA requirements of 28 U.S.C. §§ 1714 and 1715.

**Notice**

No objections to the settlement have been filed. No putative class member sent notice that he or she planned to appear at the

---

[4] According to the testimony of notice expert Shannon Wheatman, approximately 93% of the phone numbers in the database of phone numbers called have area codes from these three states. Wheatman also testified that in drafting the language contained in the notices, the language used was drafted with the knowledge that it was a nationwide class, and care was taken to use language that would not discourage anyone from a particular state from filing a claim.

[5] Kim R. Schmidt, senior vice-president of Rust Consulting, Inc., is responsible for overall claims administration in this case. Schmidt stated that in response to the notice she was only contacted by the Texas Attorney General. As of this date no Attorney General has filed an objection in the record.

3

fairness hearing, and no class member appeared at the hearing. No opt outs have been filed.[6]

At the fairness hearing notice expert Wheatman gave extensive testimony about the design and drafting of the notice plan and its implementation, the primary goal of which was to satisfy due process under the applicable legal standards.[7] The feasibility of giving class members direct notice was explored first, using the "reverse appends" method.[8] However, after consultation with the claims administrator it was determined that this method would be very costly and would not result in enough reliable, accurate and useable data to provide adequate direct notice to class members; a notice by publication plan would still be needed. According to Wheatman and Kim R. Schmidt, the representative of the claims administrator, the only reliable, consistent information for notice purposes was the area codes of the cell phone numbers in the database.[9]

---

[6] The objection and opt out deadlines were February 10 and February 22, 2013.

[7] *See*, *In re Katrina Canal Breaches Litigation*, 628 F.3d 185, 197 (5th Cir. 2010).

[8] According to Wheatman, this would essentially involve using the phone numbers in the database to try to obtain the names and addresses of the individual who is associated with that particular phone number.

[9] In making this determination, they also considered census and mobility data and other studies. This information shows, for example, that ten percent of people have cell phone area codes that
(continued...)

The essential components of the notice plan ultimately developed and implemented were print publication, internet, the settlement website and press releases.[10] The geographic composition of the class and the relative costs were considered in determining the national print and internet outlets to use in order to provide the best notice practicable to the class as a whole. Wheatman, who has extensive experience developing plain-language jury instructions, class action notices and rules of procedure, testified that the notice was composed at a ninth grade reading level because many adults read below a high school level.

Some of the highlights demonstrating the effectiveness of the notice plan are shown by: (1) the estimation that the internet banner ads on Facebook and the 24/7 Network appeared over 66 million times; (2) 369 national media outlets picked up the press release on the settlement and 205 of those were outside of Louisiana, Mississippi and Alabama; (3) payment for seeding key words in major search engines ensured internet search results related to the case were among the first five to appear; (4) the settlement website received tens of thousands of "hits" coming from all over the country, which shows the internet ads were effective; and, (5) the percentage effectiveness of the reach of the notice

---

[9](...continued)
are different from the area codes in the state where they reside.

[10] Record document numbers 238 and 240, hearing Exhibits W-3 through W-13.

5

plan in the three-state area was 80% and for the overall class was 74-76%, which shows that the notice complied with Federal Judicial Center ("FJC") checklist/requirements.[11]

According to Schmidt, at the time of the hearing approximately 770 claims had been filed on the settlement website, and there were approximately 80 requests from individuals for claim forms. This is less than one percent of the total class, but the claims process is still going on, and this rate of filing is consistent with other TCPA class action settlements awarding similar relief. She also explained that while some actions had higher claim filing rates, those cases did not have the pre-screening feature of the settlement website for this case. That feature allows a person to enter a phone number to find out if the person is in the class, thereby reducing the number of claims made by cz
persons who are not class members.

Therefore, the testimony and the exhibits demonstrate that: (1) the notice directed to all class members who would be bound by the settlement complies with this court's orders and Rule 23(e); and, (2) the content and form of the notices provided have been reasonable and sufficient to apprise all interested parties and class members of their right to object or opt out. The court finds that the requirements of due process and notice under Rule 23 are satisfied.

---

[11] Based on the FJC checklist, 70 to 95 percent is considered notice that is high-reaching.

**Requirements of Rule 23(a) and (b)(3)**

The class is so numerous that joinder of all members is impracticable. Based on the number of phone numbers the record shows that the class is composed of more than 1,400,000 class members.[12]

With regard to commonality, the record demonstrates that all the class members received pre-recorded robo-call cell phone messages advertising promotions for pizza purchases at RPM's Domino's franchise pizza stores. Each member of the class asserts claims against the same defendants for violation of the TCPA - liability which the defendants deny - and seeks the same relief. The relief sought is actual damages in the form of monetary losses associated with the cost of the receipt of the calls, usage of cellular phone minutes and plan allowances, inconvenience, and invasion of privacy, or alternatively statutory damages and injunctive relief to stop the defendants from placing any more pre-recorded calls in violation of the TCPA. Therefore, there are questions of law and fact common to the class, and these predominate over any individual questions that affect only an individual class member. The class representative received pre-

---

[12] The total number of class members as identified by the defendants' records for both sub-classes is 1,466,848, comprised of 314,231 in the Monetary sub-class, and 1,152,617 in the Merchandise Voucher sub-class. Record document number 230-1, Memorandum in Support of Motion for Final Approval of Class Action Settlement, p. 7; record document numbers 238 and 240, Exhibit S-4.

7

recorded robo-calls advertising pizza specials on her cell phone from the defendants during the time period May 20, 2006 through May 20, 2010, and she claims the same type of TCPA violations and relief as the other members of the class.[13] Therefore, her claims are also typical of the other class members.

Nothing in the record indicates that there are any conflicts of interest between the class representative and the proposed class. The fact that Spillman's claims are typical, along with the history of this litigation and her involvement in the litigation and the settlement process,[14] establishes that the class representative has fairly and adequately represented and protected the interests of the class. Based on the record in this case, the court's involvement at every step of this litigation, and counsel's many years of experience in similar class action settlements, the court also finds that class counsel are qualified and competent, and able to fairly and adequately protect the interest of the class.

A class action settlement of this litigation is also superior to any other available methods for fairly and efficiently adjudicating this controversy. The small potential recovery in an

---

[13] Record document number 57, Second Supplemental and Amending Class Action Complaint, ¶¶ 7, 15-31, 42-47.

[14] The court's review of the time records for class counsel Christopher K. Jones shows there was regular and consistent communication between counsel and the class representative on matters relevant to the litigation and settlement.

8

individual action, and the provision for statutory damages, makes it unlikely that an individual plaintiff would have an incentive or interest to bring or prosecute a separate action. The enormous size of the class, and the high degree of commonality with regard to the questions of law and fact in this case, easily make a class action settlement the most efficient and least costly way to resolve the controversy and to fairly compensate all the class members.

*Reed* **Factors**[15]

The history of this litigation shows that it has been long, hard fought, complex and expensive for both sides, and each side is also facing substantial obstacles to success if there is no settlement and the litigation continues.[16] The following facts support this conclusion.

This case has been on-going for three years. The written and oral discovery conducted has been substantial and expensive, as shown by the production and review of tens of thousands of

---

[15] The *Reed* factors are: (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense and likely duration of the litigation; (3) the state of the proceedings and the amount of discovery completed; (4) the probability of the plaintiffs' success on the merits; (5) the range of possible recovery; and, (6) the opinions of the class counsel, class representatives, and absent class members. *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir. 1983).

[16] The first four *Reed* factors and the information relevant to these factors will be addressed as a whole.

9

documents and the discovery motions filed during the past two years.[17] Evidence that the litigation thus far has been complex, expensive and hard fought, and that the settlement came as a result of arms length negotiations, is also demonstrated by the fact that the parties did not achieve a settlement until they engaged in two unsuccessful mediation sessions with an experienced, independent mediator, returned to litigating, and then after additional negotiations finally reached an agreement in November 2012.

The benefits to the class from the settlement are demonstrated by the following terms: (1) the 314,231 members of the Monetary sub-class will receive up to a $15 cash payment, which is funded by a $4,000,000 deposit by Argonaut Insurance Company and RPM, creating a total common fund amount of $9,750,000; (2) the Merchandise Voucher sub-class, the largest sub-class composed of 1,152,617 members, will receive a fully transferrable voucher worth from $6.71 to $11.99,[18] and without the settlement they would have received no benefit at all because their claims were dismissed in

---

[17] *See* e.g., record document numbers 121, 129, 145, 146, 192, 196, 203. The current stage of the proceedings in terms of discovery and motions also shows that the parties have sufficient information to evaluate the merits of their competing positions.

[18] Record document number 230-2, Exhibit 1, Affidavit of Glenn A. Mueller, Jr., Chief Financial Officer of RPM Pizza, LLC.
Class counsel and counsel for RPM jointly informed the court that the vouchers received by the members of this sub-class will be redeemable for up to 18 months from the date the voucher is issued.

10

February 2011;[19] (3) defendant RPM has changed its behavior as a result of the suit - since May 2010 it has not made the types of robo-calls alleged in the complaint, the settlement agreement contains a provision for injunctive relief with RPM agreeing to comply with the TCPA statutory and regulatory requirements applicable to pre-recorded phone messages, and the expert report submitted estimates the value of this injunctive relief at $16.2 million dollars.  Not including the estimated value of the injunctive relief, the total potential value of the cash and voucher components of the settlement is more than $20,000,000.

The certain beneficial results of the settlement are contrasted with the uncertain results if the case proceeds for several more years.  The uncertainty for both the class members and

---

[19] Record document numbers 83 and 115.  Following the *Mims* decision and a decision form the Eastern District of Louisiana in *Bailey v. Domino's Pizza, LLC*, Civil Action No. 11-04, a Motion for Reconsideration was filed by the plaintiff on April 25, 2012. Record document number 144.  Although the plaintiff's Motion for Reconsideration and numerous other then-pending motion were later dismissed while the parties negotiated the settlement, the dismissal was without prejudice to being re-noticed if the parties settlement negotiations were unsuccessful. Record document number 212.  The dismissal of these motions was clearly a case management device and not a determination of the merits of any motion.  For the purpose of determining whether to approve the class action settlement, these motions are considered as still pending when the parties agreed to the settlement.  The settling parties then consented to proceed before a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636 for the purpose of the settlement.  Record document number 214, Limited Consent to Reference of Class Settlement Approval Proceedings to Magistrate Judge.  The dismissed motions, considered herein as still pending before the district judge, will be moot as a consequence of the approval of the settlement.

11

the defendants is evident from the record. There is currently pending a Motion for Reconsideration of the dismissal of the claims of the Merchandise Voucher sub-class and a motion for summary judgment on liability by defendant Domino's. Furthermore, the defendants have disputes with liability insurers Argonaut Great Central Insurance Company and Liberty Mutual.[20] Both are denying coverage under their respective policies, and motions and coverage issues are still pending. Nevertheless, Argonaut has agreed to pay its policy limits to help create the settlement fund.

The analysis above establishes that there is no evidence or suggestion of fraud or collusion behind this settlement. Without the settlement the litigation will likely last several more years, and the result of the litigation is clearly uncertain at this time. Continuing the litigation will result in increasing costs, will not likely bring any greater benefits to the class members, and also carries with it the risk that some or all of the claims of the class members will be dismissed or reduced. Thus, consideration of the first four *Reed* factors supports the conclusion that the settlement should be approved because it is fair and reasonable, and in the best interest of the class.

The settlement reached is also within the range of possible recoveries and court approvals when compared to other TCPA cases

---

[20] *See*, *RPM Pizza, LLC d/b/a Domino's Pizza v. Liberty Insurance Underwriters, Inc.,* CA 10-684-BAJ-SCR (M.D. La.).

12

which have had settlements approved by the courts in this and other districts.[21]

Finally, the opinions of class counsel, the class representative, and any absent class members must be considered. The opinion of class counsel, as expressed at the fairness hearing and in an affidavit of counsel Christopher K. Jones have been considered. For all the reasons explained in connection with the other *Reed* factors, as well as the law firm's and his ten-plus years of experience in litigating TCPA class action suits, counsel attests that the settlement reached is fair and reasonable and in the best interest of the class. Class representative Toni Spillman also submitted an affidavit in support of the settlement.[22] Support for the settlement is also indicated by the fact that after a notice plan which satisfies due process was implemented, no objections or opt outs were received or filed.

Therefore, considering the entire record in light of the relevant factors, the court finds that the proposed TCPA class action settlement in this case is fair, reasonable and adequate, and in the best interest of the class. The court will issue a final order and judgment approving the settlement.

The issue of attorneys' fees and costs, and the incentive

---

[21] *See*, record document number 230-1, pp. 24-25.

[22] Record document number 222-4, Exhibit B, Spillman affidavit.

13

payment to the class representative, will be addressed in a separate ruling.

Baton Rouge, Louisiana, May 23, 2013.

_____
STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE